UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| STATE FARM FIRE & CASUALTY COMPANY, | ) ) ) |
| Plaintiff, | ) ) ) Docket no. 2:16-cv-67-GZS |
| v. | ) ) |
| WASI HABIBZAI et al., | ) ) ) |
| Defendants. | ) |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

Before the Court is the Motion for Summary Judgment (ECF No. 44) filed by Defendants and Counterclaim Plaintiffs Wasi Habibzai and Manija Habibzai (together, "Defendants" or "Habibzais"). For reasons explained herein, the Court GRANTS IN PART and DENIES IN PART the Motion.

**I.  LEGAL STANDARD**

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is

one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004). Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quotation marks and punctuation omitted); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation."). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party." In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993). Ultimately, summary judgment does not require "an all-or-nothing approach" and the Court may grant partial summary judgment on only certain claims or even part of a claim. Wright & Miller, 10B Federal Practice & Procedure § 2737 (4th ed. 2016); see also Fed. R. Civ. P. 56(g).

2

District of Maine Local Rule 56 prescribes a detailed process by which the parties are to place before the Court the "material facts . . . as to which the moving party contends there is no genuine issue." D. Me. Loc. R. 56(b). The Local Rule further requires each statement of material fact to be followed by a "record citation[ ] . . . to the specific page or paragraph of identified record material supporting the assertion." D. Me. Loc. R. 56(f). Ultimately, in constructing the narrative of undisputed facts for purposes of summary judgment, the Court deems any statement with a supporting record citation admitted but "may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." D. Me. Loc. R. 56(f); see also Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## II.  FACTUAL BACKGROUND[1]

On June 23, 2015, a house located at 17 Garett Avenue in Gray, Maine (the "Gray Property")[2] burned to the ground. Initial construction of this house began with the issuance of a building permit for construction of a new home in May 2002. The initial construction ran into some problems and the property thereafter became a bank-owned property. Michael Beaulieur a/k/a Beaulieu ("Beaulieu"),[3] a general contractor and real estate investor, heard about the property

---

[1] Through multiple ECF docket entries, Defendants filed a record consisting of 623 pages. See Record Table of Contents (ECF No. 57). For the sake of brevity and clarity, citations to this Record are cited with "R." with pin citation to the Bates-stamped number on the left bottom-hand corner of the page. All other items are cited using the "PageID #" generated by CM/ECF.

[2] The Court notes that the record refers to "Garett Avenue" and "Garrett Avenue" interchangeably. However, the Court's research suggests "Garett Avenue" is the proper spelling of the road in question.

[3] As explained by Beaulieu at his deposition, he first became aware of an alternative spelling of his last name in the mid-2000s as the result of an inspection of his birth certificate by the Maine Bureau of Motor Vehicles. As a result, since that time, he has alternatively used both versions of his last name. See R. 2-3.

3

from a realtor and decided to purchase the property as an investment in 2003.[4] On October 10, 2003, Beaulieu paid York Federal Credit Union $150,000 to purchase the partially constructed Gray Property.[5]

At the time of Beaulieu's purchase, the Gray Property was framed, enclosed in plywood, but missing windows, doors, and waterproofing. Between 2003 and 2004, Beaulieu installed windows, doors, a deck, and exterior "Tyvek" waterproofing. In a letter dated February 5, 2004, the Town Code Enforcement Officer informed Beaulieu the original building permit had lapsed and that he was issuing a Stop Work Order on the Gray Property. (ECF No. 52-3 at PageID # 822.) The Stop Work Order noted "structural problems" with the house and indicated an engineer review would be necessary before another building permit could issue. (Id.) Thereafter, the property sat untouched for approximately eight years.

**Beaulieu's Mortgage on the Gray Property**

Beaulieu financed his purchase of the Gray Property as well as the planned additional construction with a $295,000 loan from Downeast Mortgage Corporation ("Downeast Mortgage").[6] Downeast Mortgage was co-owned by Jim Lindvall ("Jim" or "Lindvall"), a mortgage lender and a real estate investor. In 2007 or 2008, Jim Lindvall incorporated Market Trading Company, LLC ("Market Trading"), a sole-member limited liability company, to purchase three mortgages from Downeast Mortgage; one of those mortgages was for the Gray Property. As

---

[4] Beaulieu has been investing in real estate since about 2001 and has owned forty or fifty properties in southern Maine since that time.

[5] The October 10, 2003 Warranty Deed spells the grantee's name as Michael B-e-a-u-l-i-e-u. See R. 328.

[6] In fact, between 2001 and 2014, Beaulieu financed approximately thirty or forty real estate purchases through Downeast Mortgage. On approximately fifteen other occasions, Lindvall and Beaulieu partnered on real estate deals – buying and selling land, and splitting the profit between themselves.

4

a result, Market Trading then became the mortgage holder for the Gray Property. While there is no documentation that Beaulieu ever paid off the mortgage on the Gray Property, Beaulieu maintains that by July 2012, he owed Lindvall nothing on the Gray Property.

**The Habibzais & Their Efforts to Buy a Home**

Defendants Wasi Habibzai ("Wasi")[7] and his wife, Manija Habibzai ("Manija") have lived in Maine since immigrating to the United States from Afghanistan in 1990. They have been married for approximately seventeen years and have three sons. Manija speaks English as a second language; for Wasi, English is a third language.[8] Together, they have operated a used car business known as Silver Motors for more than ten years.[9] The Habibzais are Muslim. In accordance with their religious practice, the Habibzais do not charge interest or incur interest charges. As a result, they generally do not use credit cards[10] and conduct much of their business in cash. However, they also use debit cards and maintain bank accounts.

Sometime in the early 2000s, Wasi was introduced to Beaulieu by Beaulieu's brother. Beaulieu, in turn, introduced Wasi to Lindvall in 2008. This introduction was made in connection with Wasi negotiating to buy a property in Buxton, Maine, that was then an investment jointly held by Beaulieu and Lindvall. Wasi made a $5,000 cash deposit towards the purchase of this Buxton property. He then discovered some issues with the property and sought the return of his deposit.

---

[7] Wasi has also been called "Wasi John" and "Wasi John Habibzai." R. 48.

[8] Both sat for depositions in connection with this case that were conducted in English. See generally R. 45-261.

[9] Wasi has also earned income as a partner in Triton Property Management, a property management company outside of the United States.

[10] At her deposition, Manija did testify that she has one credit card that she uses.

5

According to Wasi, Lindvall and Beaulieu "screw[ed]" him by refusing to give him back his deposit for about four years. (W. Habibzai 9/2/15 Dep. (ECF No. 53) at PageID # 851.)

Instead of returning the deposit, Lindvall eventually offered to sell Wasi the Gray Property by sometime in 2012 or 2013. Contemporaneous documentation of this agreement is lacking.[11] However, the deposition testimony of the Habizais and Michael Beaulieu, both establish an agreement between Wasi, Beaulieu, and Lindvall to sell the Gray Property to the Habibzais.[12]

The Habibzais recommenced construction on the Gray Property shortly after reaching an agreement to buy it. Working alongside family and friends,[13] the Habibzais completed additional construction.[14] (R. 281-86; 337; 384-401.)[15] Wasi also obtained an electrical permit in October 2013 and established electrical service for the Gray Property in his own name. (R. 337 & 340-42.) However, prior to the fire on June 23, 2015, the Habibzais did not obtain any building permit or certificate of occupancy for the Gray Property.

---

[11] Notably, Wasi indicates there was a written agreement between him and Lindvall covering the purchase of the Gray Property but that the agreement was lost either among the papers that were stored at the property on the day of the fire or as part of the papers that went missing in connection with Lindvall's death. Given the factual dispute, the Court proceeds on the assumption that there is no written agreement for purpose of summary judgment.

[12] Although Lindvall's personal representative, Abigail Lindvall, could not locate any written documentation of the agreement to sell the Gray Property, she acknowledged having "one conversation about Wasi Habibzai" with her father during which her father asked her whether she could draft a contract for Wasi to "rent-to-own" the Gray Property. R. 30. Because Abigail indicated she did not want to be involved in drafting said contract, she had no further conversations with her father about the Gray Property or Wasi before her father's death.

[13] Some assistance in completing construction came from workers arranged by Lindvall.

[14] The record includes multiple receipts for construction materials, appliances, and other items that were apparently purchased by the Habibzais in 2013 and 2014. See, e.g., R. 346-83. To the extent that State Farms has objected to these receipts as "inadmissible hearsay," the Court believes they would fall under the business records exception. State Farm SMF (ECF No. 62) at PageID #s 1167-68. In any event, the Court notes that it would reach the same result even if it were to sustain State Farm's hearsay objections to the receipts.

[15] State Farm objects to Defendants' reliance on three affidavits from Garett Avenue neighbors regarding their observations of work being done on the Gray Property on the basis that these witnesses "were not identified until after the close of discovery." State Farm Response SMF (ECF No. 62) at PageID # 1169. This objection is overruled for purposes of summary judgment. However, the Court notes that even if it excluded the affidavits from its consideration, its view of the undisputed facts regarding additional construction occurring prior to the June 23, 2015 fire would be unchanged.

Pursuant to the terms of their agreement, Wasi made monthly cash payments to Lindvall toward the purchase of the Gray Property.[16] These payments varied in amount. According to Wasi, the payments ranged from at least $800 to approximately $9,000 each and all of the necessary payments to Lindvall (totaling over $80,000) were made before September 19, 2014.[17] Ultimately, the earliest documentation of the transfer of the Gray Property from Beaulieu to Wasi is a quitclaim deed dated March 17, 2015.[18] (R. 403-04.) This quitclaim deed was recorded on April 13, 2015.

**Insurance Coverage on the Gray Property**

After making the necessary payments to purchase the Gray Property, the Habibzais acquired a homeowner's insurance policy on the Gray Property from State Farm Fire and Casualty Company ("Plaintiff" or "State Farm") through John Couture Insurance Agency on September 19, 2014 (hereinafter, "the Policy"). The Policy provided a dwelling coverage limit of $397,200 and

---

[16] While Abigail found no records documenting these payments, among the records located after Lindvall's death were multiple checks made out to the Habibzais; these checks were dated 2014 and drawn from multiple accounts. See ECF No. 52-2 at PageID #s 783-93. Many of these checks were written from a "Mark Noel Kathleen Noel Vacation Fund" account, which actually held funds belonging to Lindvall. See id. at PageID #s 783-89 & R. 36. On the record presented, the Court can only conclude that the reason for these checks is disputed. State Farm has suggested that these checks may reflect the Habibzais receiving compensation for work completed on the Gray Property "for the benefit of Mr. Lindvall or the mortgage holder, Market Trading." State Farm SMF (ECF No. 62) at PageID # 1166. The Court concludes that such a suggestion is merely speculative and unsupported by any record evidence. In fact, Wasi testified that he and Manji assisted Lindvall by simply cashing the checks, returned the bulk of the funds to Lindvall, and were provided a small fee for their role in the check cashing. See W. Habibzai 9/2/15 Dep. (ECF No. 53) at PageID # 859-60.

[17] Wasi also maintains that he made paid Beaulieu an additional $4,700 at the time he received the deed. R. 63. Beaulieu indicated he was paid approximately $4,000 to cover tax payments he had made on the property. R. 20.

[18] Beaulieu recalls signing an earlier quitclaim deed around the time that Wasi, Beaulieu, and Lindvall had reached the agreement for Wasi to purchase the Gray Property. R. 17. However, Wasi testified that he did not receive any deed until after he completed his payments to Lindvall in 2014. R. 67. There is also a later corrective deed dated December 15, 2015, which contains the spelling of Beaulieu's last name that excludes the "r" and thereby matches the spelling contained in the October 2003 warranty deed under which Beaulieu received original title to the Gray Property. See R. 328 & 468.

an additional personal property coverage limit of $297,900.  The Habibzais made their first premium payment to State Farm on the day they acquired the Policy.  They continued to make timely payments during all relevant times thereafter.  The Habibzais' premium payments were made in cash.

**The Passing of Jim Lindvall**

Lindvall passed away suddenly on October 25, 2014.  Shortly before his death, Lindvall had a one-car accident with his personal vehicle on his own property.  He called Wasi for assistance.  According to Wasi, he had Lindvall's Cadillac towed to Silver Motors for repair and gave Lindvall his Volvo as a loaner.  The Volvo contained some of Wasi's personal papers, including papers related to the Gray Property.  According to Wasi, those papers were no longer with the vehicle once it was returned following Jim's death.  Wasi also had a monetary dispute with Lindvall's heirs immediately following his death about other vehicles, including two Cadillacs that were located at Silver Motors.

Lindvall left behind three grown children, including his daughter, Abigail Lindvall ("Abigail").  Abigail graduated from law school in 2013, and practiced law for a brief period of time in Massachusetts.  She was appointed Personal Representative for her father's estate on December 15, 2014.  Abigail left her in-house counsel position in order to work on the Lindvall's Estate, including winding-up Jim's various business enterprises, which consisted of at least eight businesses he had operated or co-operated in between 2010 and 2014.

Abigail has acknowledged that her father "was not a wonderful record keeper." (R. 29.) Nonetheless, as the Personal Representative of Lindvall's Estate and the acting principal of Market Trading, she searched all of her father's available personal and business records and found no

documents to suggest that there was ever an agreement to sell the Gray Property to the Habibzais. Likewise, she found no indications in her father's personal and business records that Lindvall had any deal or agreement with Beaulieu with regard to the Gray Property or a swap of that property. She similarly found no evidence in her father's personal or business records of any payments made by the Habibzais toward the purchase of the Gray Property. Rather, the documentation she found suggested that Market Trading still held a mortgage on the Property as security for the $295,000 loan to Beaulieu.

**Market Trading's Foreclosure on the Gray Property**

On May 11, 2015, Abigail Lindvall, as acting principal of Market Trading, filed a foreclosure complaint in Cumberland County Superior Court to foreclose on the mortgage on the Gray Property (hereinafter, "the Initial Foreclosure Complaint"). (R. 307-316.) Prior to filing the Initial Foreclosure Complaint, Abigail Lindvall had reviewed all of the records she could find with regard to her father's personal business and the business of Market Trading. She found no evidence that any payments had been made to satisfy Mr. Beaulieu's $295,000 obligation secured by the mortgage. As a result, the Initial Foreclosure Complaint named Beaulieu as the defendant and eight persons or entities as parties-in-interest based upon liens of record. Beaulieu was "very surprised" to be named as the defendant in the Gray Property foreclosure because he believed at that point that Wasi "own[ed] the house." (R. 16.) The Habibzais were not included as defendants or parties-in-interest in the Initial Foreclosure Complaint. At the time Abigail filed the initial complaint, she did not believe the Habibzais had any interest in the Gray Property.

On or about May 29, 2015, Market Trading filed an amended foreclosure complaint in Cumberland County Superior Court regarding the Gray Property (hereinafter "the Amended

9

Foreclosure Complaint"). (R. 317-327.) Among the changes in the Amended Foreclosure Complaint was the addition of Wasi as a party-in-interest. The change to add Wasi as a party-in-interest to the Amended Foreclosure Complaint was prompted by a registry search performed by Abigail after an incident on the Property.[19] However, Abigail still had seen no records that suggested that her father had made any commitment to the Habibzais concerning the Gray Property. (R. 40.) According to the Amended Foreclosure Complaint, the total due on the note secured by the Market Trading mortgage on the Gray Property as of March 31, 2015, was $500,490.19, with further amounts accruing at a per diem rate of $65.12. Wasi was served with the Amended Foreclosure Complaint about twenty days before the fire occurred at the Gray Property. Ultimately, this foreclosure action was resolved via a settlement agreement between Market Trading and the Habibzais on December 1, 2015. (R. 114-18.)

**The Real Estate Tax Lien on the Gray Property**

Between 2012 and 2014, the Town of Gray recorded three tax liens on the Gray Property for unpaid real estate taxes. As a result of the first of those tax liens, an automatic foreclosure occurred vesting title to the Gray Property with the Town as of December 26, 2013.

After Lindvall's death, Market Trading began making payments to the Town to satisfy the unpaid taxes, interest, and costs. By June 25, 2015 (two days after the fire), all of the back taxes were paid in full. On August 4, 2015, the Town re-conveyed the Gray Property to Beaulieu because he was the owner of record at the time that the equity of redemption period expired, and because neither Wasi, Beaulieu, nor Market Trading responded when the Town solicited their

---

[19] Specifically, Abigail checked the registry after she was advised that Wasi had punched a locksmith hired by Market Trading who was on the Gray Property to change the locks.

respective opinions as to whom the deed should be re-conveyed. Under these circumstances, the Town's general practice was to deed the property back to the record owner. (R. 287-88.)

The March 17, 2015 quitclaim deed that Wasi received from Beaulieu was executed and delivered after this tax foreclosure. In fact, Wasi was not aware that the Town was owed back taxes on the Property until after he received the deed from "Michael Beaulier." The December 15, 2015 corrective deed from "Michael Beaulieu" provides a clear chain of title passing the Gray Property from Beaulieu to Wasi Habibzai. (R. 468.)

### Habibzais' Proof of Damages Resulting from the Gray Property Fire

Following the fire, the Habibzais lived in a hotel room with their three sons. Wasi contacted Beaulieu four or five times to find out how much it would cost to clean up the remnants on the property; his concern was minimizing environmental contamination and preserving the Gray Property for future use. However, Wasi later decided to hold-off on any clean up.

Shortly after the fire, Wasi hired Bruce Knowlton, a licensed public adjuster with Professional Loss Adjusters, Inc., to assess the damages sustained in the fire. Knowlton is designated as an expert witness on damages in this case.[20] Knowlton determined that the replacement value for the structure is $513,217.96 and the replacement value for the personal property lost in the fire is $209,971.10. (R. 470.) With respect to the contents of the house, Knowlton estimated that fifty percent of the house contents listed in his report was based on what he observed upon his own post-fire inspection of the premises. The other half of the items listed was based entirely on what the Habibzais reported as being in the house at the time of the fire.

---

[20] Knowlton has a financial interest in the outcome of the litigation because his compensation is based on a percentage of the Habibzais' recovery.

11

The Habizais did not provide Knowlton with any receipts for any personal property they claimed to have lost in the fire. With regard to one item, a rug, to which Knowlton assigned a value of $64,000, Knowlton admitted that he did not know the rug's manufacturer, the age of the rug, or how long the Habibzais had reportedly owned it. Knowlton assigned a value of $14,400 to a watch without any information other than it was a gold Omega watch with a leather strap apparently made in 1957.

With respect to legal costs, the Habibzais' legal counsel has spent no less than 113.6 hours in defense of this case and has incurred $2,503.87 in costs and disbursements. At an hourly rate of $225 per hour, the Habibzais have incurred at least $25,560 in attorney's fees.

**State Farm's Investigation of the Claim for the Gray Property Fire**

After receiving notice of a claim for the loss of the Gray Property, State Farm began an investigation by assigning a field adjuster. State Farm requested documents from the Habibzais regarding their ownership of the Gray Property but only received a quitclaim deed with a misspelling of the grantor in response to its request. Upon further investigation, State Farm determined that the quitclaim deed post-dated the Town's automatic foreclosure. These two title issues, the apparent misspelling of Beaulieu's name and the tax foreclosure, raised concerns for State Farm that the Habibzais might not have had an insurable interest in the Gray Property.

Additionally, the Habibzais did not produce documentation of their investments into the Gray Property in response to State Farm's requests. Rather, Wasi indicated he had made improvements but paid cash for the improvements. As a result, State Farm questioned whether the Habibzais had in fact made improvements to the property. State Farm also determined that no certificate of occupancy had been issued for the property.

On February 8, 2016, State Farm initiated the present action for a declaratory judgment seeking to resolve the issue of whether the Habibzais had an insurable interest.

### III. DISCUSSION

Via the pending Motion for Summary Judgment, the Habibzais ask this Court to enter judgment in their favor on two counterclaims: (1) Breach of Contract and (2) Unfair Claims Settlement Practices, 24-A M.R.S.A. § 2436-A. They assert that the summary judgment record further allows the Court to award them damages totaling $808,021.67 on these two counterclaims. For its part, State Farm opposes the Motion and argues that its underlying claim for a declaration that the Habibzais lacked an insurable interest pursuant to 24-A M.R.S.A. § 2406 is trialworthy and cannot be resolved on summary judgment. Resolution of Defendants' counterclaims requires the Court to first consider the insurable interest issue as there can be no breach of contract or unfair claims settlement practices if there was no insurable interest.

#### A. Insurable Interest

The applicable statute in the Maine Insurance Code is aptly titled "Insurable interest, property" and provides:

> **1.** No contract of insurance of property or of any interest in property or arising from property shall be enforceable as to the insurance except for the benefit of persons having an insurable interest in the things insured as at the time of the loss.
>
> **2.** "Insurable interest" as used in this section means any actual, lawful, and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage or impairment.

24-A M.R.S.A. § 2406.

As clearly pronounced in Morin v. State Farm Fire & Cas. Co., 453 F. Supp. 2d 177 (D. Me. 2006), "under Maine law, legal title is not necessary for an insurable interest." Id. at 182 (citing Getchell v. Mercantile & Mfrs. Mut. Fire Ins. Co., 83 A. 801, 802 (Me. 1912) & Gilman v.

Dwelling-House Ins. Co., 17 A. 544, 544 (Me. 1889)). In Morin, the district court ultimately held that the insured had an insurable interest although there was no legal title and "[t]here was no written agreement, no express terms, no express interest rate, and no detail as to other 'costs'" and no legal title. Id. In reaching this holding, the district court explicitly noted the per curiam Law Court opinion in Hingham Mut. Fire Ins. Co. v. McLellan, 746 A.2d 916 (Me. 2000). See Morin, 453 F. Supp. 2d at 181-82. In Hingham, an evenly divided Law Court upheld the trial court finding of an insurable interest despite the fact that the insured had lost title at the time of the loss due to a municipal tax lien.[21] Applying the reasoning of Morin, the deed and title issues that existed with the Gray Property at the time of the fire do not preclude a finding that the Habibzais had an insurable interest.

In Morin, the insured supported his claim of an insurable interest with direct testimony regarding the oral "rent-to-buy" agreement from the seller and title holder, Smith, and Morin himself. Id. However, in that case, the end result was the denial of summary judgment for the insurer. See id. at 184. In this case, the insured seeks summary judgment while the insurer maintains that there is a trialworthy issue as to insurable interest. Thus, the Court must consider whether the record viewed in the light most favorable to State Farm establishes a genuine dispute as the Habibzais' insurable interest in the Gray Property.

There is no dispute that the transfer of the Gray Property to the Habibzais is not well-documented and apparently involved unconventional financing. There is no available written agreement laying out the details of the agreement between Habibzai, Beaulieu, and Lindvall and

---

[21] As the Law Court itself has acknowledged, a per curiam "[a]ffirmance by an equally divided Court establishes no precedent. See Maine Human Rights Comm. v. Local 1361, 383 A.2d 369, 377 n. 20 (Me. 1978) (citing Neil v. Biggers, 409 U.S. 188 (1972)). Nonetheless, in the absence of any pronouncements from the Law Court on this "insurable interest" issue since Hingham or Morin, the Court finds the reasoning expressed in both of these trial court opinions persuasive.

14

no payment records are available. However, Defendants proffer their own testimony of an agreement as well as supporting testimony from Beaulieu. While direct supporting testimony from Lindvall is unavailable, this lack of testimony leaves the testimony of the Habibzais and Beaulieu essentially undisputed. Additionally, while there is undeniably a dispute as to the extent or value of the improvements made to the Gray Property after the Habibzais took possession of the property, there is no genuine dispute that the Habibzais invested in improvements to the property prior to the fire. In short, even viewing the evidence in the light most favorable to State Farm, the record would not allow a reasonable factfinder to conclude that the Habibzais had no insurable interest in the Gray Property on June 23, 2015.

In opposing summary judgment on the issue of insurable interest, State Farm argues that this Court should also consider their contention that "Defendants did not have an insurable interest in 17 Garett Avenue *at the time they procured insurance*." (Pl. Response (ECF No. 51) at PageID # 724 (emphasis added).) To the extent that State Farm urges the Court to look at the issue of insurable interest on September 19, 2014, instead of—or in addition to—the issue of insurable interest on June 23, 2015, that argument finds no support in the plain statutory language of 24-A M.R.S.A. § 2406, which expressly references "the time of the loss" as the moment in which there must be an insurable interest.[22]

To the extent that State Farm invokes the statute of frauds as a basis for declining to find an insurable interest, the Court also concludes that this argument is without merit. See 33 M.R.S.A. § 51(4). Notably, a similar statute of frauds argument was rejected by the district court in Morin.

---

[22] In any event, the Court notes that the undisputed evidence for purpose of summary judgment suggests that the only change in Habibzais' insurable interest between September 19, 2014 and June 23, 2015 might be in the amount due to the ongoing work on the property and changes in items stored at the property. On the issue of title, it is clear that the Town held title on both dates. However, the undisputed testimony of Wasi and Beaulieu is that the agreement to transfer the property to the Habibzais was finalized prior to September 19, 2014.

15

See Morin, 453 F. Supp. 2d at 182. Here, as in Morin, Beaulieu and Wasi both testified that there was an agreement to transfer ownership of the property from Beaulieu to Wasi. The Habibzais invested in improvements to the Gray Property in reliance on this agreement. Under these circumstances, the absence of a written agreement detailing what Lindvall received from the Habibzais and what Lindvall promised to give Beaulieu in exchange for the transfer of the Gray Property does not provide a statute of frauds bar to the Habibzais' claim of an insurable interest. See Gendron v. Pawtucket Mut. Ins. Co., 384 A.2d 694, 697 (Me. 1978) (refusing to allow the insurer to "benefit from collateral contractual relations between the insured and a third person").

In short, to the extent that State Farm filed this action seeking a declaration that there was no insurable interest, the Court concludes that the record amply supports a finding that the Habibzais' interest in the Gray Property met Maine's insurable interest threshold on the day of the fire. As a result, Defendants are entitled to a declaration that they had an insurable interest at the time of the loss.

### B. The Counterclaims

The Court next must consider the impact of the declaration that Defendants had an insurable interest on Defendants' two pending counterclaims.

#### 1. Count One: Breach of Contract

With respect to breach of the Policy, State Farm's brief argument in opposition to a grant of summary judgment on this counterclaim rests on a finding that there is no insurable interest and thus no enforceable policy for State Farm to have breached. (State Farm Response (ECF No. 51) at PageID # 732.) Having determined there was an insurable interest, the Court concludes that the Habibzais are entitled to a finding that State Farm breached the Policy by denying their claim.

However, the record undeniably establishes a host of trialworthy issues as to the damages that might be recoverable for that breach. Thus, to the extent the Habibzais have sought summary judgment on the issue of damages, the Court DENIES IN PART the Motion.

### 2. Count Two: Unfair Claims Settlement Practices: 24-A M.R.S.A. § 2436-A

In relevant part, Maine's Unfair Claims Settlement Practices statute reads:

> **Civil actions.** A person injured by any of the following actions taken by that person's own insurer may bring a civil action and recover damages, together with costs and disbursements, reasonable attorney's fees and interest on damages at the rate of 1 ½% per month:
> . . . .
>     E. Without just cause, failing to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear.

24-A M.R.S.A. § 2436-A(1). The statute further defines "without just cause" as "refus[ing] to settle claims without a reasonable basis to contest liability, the amount of any damages, or the extent of any injuries claimed." Id.

While the Court has concluded that State Farm cannot generate a trialworthy issue on the question of the Habibzais insurable interest, this conclusion is reached on the record now available to the Court. However, it is far from clear when State Farm had access to all of this information. As a result, it is not a forgone conclusion that State Farm was without "just cause" in choosing to file this action rather than settle the Habibzais claim based on the information available before the completion of discovery. In short, the record now before the Court generates a trialworthy issue as to whether there was a reasonable basis for State Farm to contest the Habibzais insurable interest and when such a reasonable basis may have ceased to exist. In general, reasonableness is not amenable to summary judgment. See, e.g., Candelario Del Moral v. UBS Fin. Servs., Inc., 699 F.3d 93, 100 (1st Cir. 2012) ("[R]easonableness . . . is usually an issue for a factfinder."); Hawkesworth v. Nationwide Mut. Ins. Co., No. 2:10-CV-232-GZS, 2011 WL 2471741, at *9 (D.

Me. June 21, 2011) (concluding that "a 'reasonableness' determination" could not "be resolved on summary judgment"). Viewing the record in the light most favorable to State Farm, a factfinder could determine that multiple pieces of undisputed evidence put into the record in connection with this Motion were not available to State Farm earlier and, thus, there was a reasonable basis for State Farm to question the Habibzais' insurable interest.

Additionally, there are a multitude of trialworthy issues as to the amount of damages owed under the terms of the Policy. As a result, it is not possible to resolve Count Two via summary judgment.

## IV. CONCLUSION

For the reasons just given, Defendants' Motion for Summary Judgment (ECF No. 44) is GRANTED IN PART AND DENIED IN PART. Specifically, judgment shall enter in favor of Defendants on Plaintiff's request for a declaratory judgment with a finding that, as a matter of law, Defendants did have an insurable interest in the Gray Property at the time of the loss. Additionally, the Court GRANTS the Motion on the liability portion of Defendants' counterclaim for Breach of Contract (Count One). With respect to the counterclaim for Unfair Claims Settlement Practices (Count Two) and damages associated with Count One, the Motion is DENIED and this matter shall be placed on the Court's next available civil trial list.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 22nd day of August, 2017.